1
2
3
4
5
6
7
8

9 **UNITED STATES DISTRICT COURT**

10 **SOUTHERN DISTRICT OF CALIFORNIA**

11 CARLOS CORONA,                    Civil No.        07-2117 BTM (NLS)

12                    Petitioner,

**REPORT AND RECOMMENDATION RE**
13        vs.                          **GRANTING IN PART AND DENYING IN**
                                       **PART PETITION FOR WRIT OF**
14 V.M. ALMAGER, Warden,              **HABEAS CORPUS**

                          Respondent.
15

16

17 **I.    INTRODUCTION**

18        Carlos Corona, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus

19 pursuant to 28 U.S.C. § 2254 challenging his San Diego County Superior Court conviction in case

20 number SCD160797 for one count of attempted murder.  (Lodgment No. 1, vol. 1 at 0016.)  The jury

21 also found he personally used and discharged a firearm, that he caused great bodily injury or death by

22 personally using a firearm and that the attempted murder was committed for the benefit of a street gang.

23 (*Id.* at 0017.)

24        Corona claims his federal constitutional rights were violated for the following reasons: (1) The

25 prosecutor removed African-Americans from the jury, in violation of his Sixth and Fourteenth

26 / / /

27 / / /

28 / / /

1   Amendment rights; and (2) he was prevented from presenting favorable evidence from a witness, in

2   violation of his Fifth, Sixth and Fourteenth Amendment rights. (Pet. at 6-10.[1])

3          The Court has considered the Petition, Respondent's Answer and Memorandum of Points and

4   Authorities in Support of the Answer, the Lodgments submitted by Respondent, and all the supporting

5   documents submitted by the parties. Based upon the documents and evidence presented in this case, and

6   for the reasons set forth below, the Court recommends that the Petition be **GRANTED** as to claim one

7   of the petition and **DENIED** as to claim two.

8   **II.    FACTUAL BACKGROUND**

9          This Court gives deference to state court findings of fact and presumes them to be correct.

10  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28

11  U.S.C.A. § 2254(e)(1)(West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings

12  of historical fact, including inferences properly drawn from these facts, are entitled to statutory

13  presumption of correctness). The facts as found by the state appellate court are as follows:

14          On the night of August 13, 2003, Kenneth Guyton was shot five times by a man
        whom Guyton identified as Corona. Guyton, age 38 at the time of trial, had used
15      methamphetamine since he was 19 years old. He had five felony convictions, and had
        repeatedly been in prison. He was a member of an Otay gang, and when he was in prison
16      he was a member of the Hispanic "Southern" gang. His gang moniker was "Chapo."

17          One of Guyton's methamphetamine suppliers was Monica Yanez. Yanez sold
        methamphetamine for the Mexican Mafia gang. Yanez frequently "fronted" Guyton the
18      drugs with the understanding that he would pay her later. In June or July 2003, Guyton
        lost his job and was living in hotels or his truck. During the days preceding the shooting,
19      Corona had allowed Guyton to spend the night at a house in Eastlake where Corona was
        living with a girlfriend. Corona, known as "Li'l Man," was a member of the National
20      City "Locos" gang.

21          During this time period, Guyton had not paid Yanez for drugs she sold him
        because he was unemployed. He owed Yanez $500, but he reduced the debt to $250 by
22      trying to help Yanez's brother post bail. Guyton and Yanez had repeated phone
        conversations about the money he owed her.

23
24          On August 13, 2003, Guyton played chess and smoked methamphetamine with
        some visitors at the Eastlake house, and then "vegged out" at the house the rest of the
25      day. At some point Guyton noticed his cell phone, which had been plugged into the
        wall, was no longer there. He asked Corona about the phone, but Corona stated he had
26      not seen it. Guyton never found his cell phone. That same day Yanez's brother, Jose
        Yanez, known as "Trips," arrived at the Eastlake house. Trips and Corona worked on
        installing a stereo in Trips's car, an older model, black, two-door Bronco vehicle.

27

28
        ─────────────────────
        [1] The Court has renumbered the pages of the petition in numerical order for the sake of clarity.

In the evening, about two carloads of gang members arrived at the house. Yanez was with the group. Guyton approached Yanez as she got out of her vehicle. Yanez asked Guyton "Where's my fucking money, Chapo?" Guyton told her he was working on getting it. Yanez and the rest of the group entered the house, sat around for "a minute," and then left. The group had been getting ready to smoke methamphetamine, but all of a sudden Yanez "looked disgusted" and changed her mind. Guyton walked with Yanez out to the street and told her he was going to get her money to her. Yanez gave him a look as if she were disgusted.

After the group left, Guyton started sorting laundry. However, Corona interrupted him and told him to "get ready to go." Around 9:30 p.m., Corona, Guyton, and Trips left the house in Trips's black Bronco. Trips was driving; Corona was sitting in the front passenger seat; and Guyton was sitting in the backseat behind Corona. Guyton thought they were going out "[t]o come up with the money" owed to Yanez. While they were driving, Guyton fell asleep. When he woke up, he noticed they were in east San Diego; he then fell asleep again until Corona woke him up and told him to get out of the vehicle. Corona got out of the vehicle and moved the front passenger seat back to allow Guyton to exit. When Guyton was outside the vehicle, Corona shot Guyton, saying that the shooting had been "okayed by the homies," and "'this is for the money that you owe Monica [Yanez]. [¶] ... [¶] This is for fucking with my bitches.'" After he was shot, Guyton saw the headlights of another car coming up the street; he managed to get in front of the car and told a man in the car he needed help.

During their investigation of the shooting, the police discovered that phone calls to Yanez from Guyton's cell phone were made minutes before and after the shooting. At Yanez's residence, the police found evidence of methamphetamine sales and a "pay and owe" sheet indicating that "Chapo" (Guyton) owed Yanez $500. There was also a notation indicating that "Li'l Man" (Corona) owed $1,090 to Yanez. Expert witnesses testified that a drug debt can be "clean[ed] ... up" by performing a "hit" for the gang, and that a gang may order a shooting or assault to set an example to other people who owe money for drugs.

Corona presented an alibi defense through the testimony of a girlfriend, who stated that Corona spent the night with her at her home in Lemon Grove on the night of August 13, 2003.

(Lodgment No. 7 at 2-4.)

## III.   PROCEDURAL BACKGROUND

On February 24, 2004, the San Diego County District Attorney's Office charged Carlos Corona with one count of attempted murder in violation of California Penal Code ("Penal Code") sections 187(a) and 664. (Lodgment No. 1, vol. 1 at 0016.)[2] The District Attorney's Office also alleged in the amended indictment that Corona personally used a handgun, within the meaning of Penal Code section 12022.53(b), personally discharged a handgun, within the meaning of Penal Code section 12022.53(c), personally used a handgun and proximately caused great bodily injury or death, within the meaning of

---

[2]  Corona was originally charged, along with 34 codefendants, in a 56-page indictment. His case was eventually severed. (Lodgment No. 1, vol. 2 at 0418.)

Penal Code section 12022.53(d) and committed the attempted murder for the benefit of, at the direction of, and in association with a criminal street gang, within the meaning of Penal Code section 186.22(b)(1).  (*Id.* at 0017.)  Corona was also alleged to have suffered a prior conviction for which he had served a prison sentence.  (*Id.* at 0050.)

Following a jury trial, Corona was convicted of attempted murder.  (Lodgment No. 1, vol. 2 at 0455.)  The jury also found the gun and gang allegations to be true.  (*Id.* at 0455-56.)  At a bench trial following the verdicts, Corona admitted the prior conviction allegation.  (*Id.* at 0452.)  He was sentenced to seventeen years on the attempted murder and gang enhancement charges and twenty-five years-to-life for the charge of personally using a handgun which proximately caused great bodily injury or death.  (*Id.* at 0409-10.)

Corona appealed his conviction to the California Court of Appeal for the Fourth Appellate District, Division One.  (Lodgment No. 4.)  The state appellate court affirmed his conviction in an unpublished opinion filed October 20, 2006.  (Lodgment No. 7.)  He then filed a Petition for Review in the California Supreme Court, which that court denied without citation of authority. (Lodgment Nos. 8, 9.)

Corona filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 in this Court on November 5, 2007 [doc. no. 1].  Respondent filed an Answer and a Memorandum of Points and Authorities in Support of the Answer to the Petition on February 26, 2008 [doc. no. 8].  Corona did not file a Traverse.

**IV.**   **DISCUSSION**

   **A.**   **Scope of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a) (West 2006) (emphasis added).  As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (West 2006) (emphasis added).

"[The Anti Terrorism and Effective Death Penalty Act] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Womack v. Del Papa*, 497 F.3d 998, 1001 (9th Cir. 2007) (quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)). To obtain federal habeas relief, Corona must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). A state court, however, need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

/ / /

**B.      Analysis**

Corona alleges the following claims in his petition.  First, he claims he was denied his Sixth and Fourteenth Amendment rights when the prosecutor improperly struck African-Americans from his jury in violation of *Batson v. Kentucky,* 476 U.S. 79 (1986).  Second, he alleges that his Fifth, Sixth and Fourteenth Amendment rights were violated when the prosecutor failed to disclose the fact that a possibly exculpatory witness had moved out of state and the trial court refused to grant a continuance to permit the defense to locate her or grant a motion for a new trial.  (Pet. at 7-9.)  Respondent contends the state court's adjudication of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. in Supp. of Answer at 5-10.)

1.      *Batson Claim*

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prevents a prosecutor from systematically eliminating potential jurors on the basis of racial identity. *Batson*, 476 U.S. 79.  Corona argues the prosecutor systematically used his peremptory challenges to exclude the only two African-American jurors, George O. and Edmund O., from his jury in violation of the federal Constitution and *Batson*.  Corona raised this claim in his petition for review filed in the California Supreme Court which denied it without citation to authority.  (Lodgment No. 9.)  Accordingly, this Court must "look through" to the California appellate court's opinion denying this claim as the basis for its analysis.  *Ylst*, 501 U.S. at 801-06.

a.      *Voir Dire of George O. and Edmund O. and The Trial Court's Batson Inquiry*

In its opinion, the state appellate court summarized the following facts, which are supported by the record, and which lead up to the prosecutor's peremptory strikes of George O. and Edmund O.:

> The jury venire consisted of 50 prospective jurors.  George O. and Edmund O., the only African-American prospective jurors, were seated next to each other and identified as juror numbers 28 and 29.
>
> As part of the voir dire process, the jurors orally answered a list of standard questions the court had provided to elicit general background information.  George O. answered the questions on the questionnaire by stating he works in manufacturing; he is single with no children; he had no prior jury duty and no friends in law enforcement or the legal profession; and he thought he could be fair.  Next, Edmund O. answered the questions by stating he works as a senior custodian at a college; his wife works at the same college; he has two children who work at a department store and at a community college; he had two cousins in law enforcement both of whom are deceased; he has a

1   cousin who works as a detective for the Chicago police department; and there was no
    reason he could not be fair.

2

3       The trial court then inquired whether any of the jurors had close friends or
    relatives who had been victims of crimes similar to the ones alleged against Corona; i.e.,
    attempted murder or assault with a firearm.  Edmund O. advised the court that about 10

4   years earlier three of his cousins had been murdered in San Diego.  Edmund O. explained
    that detectives met with his family and told them they knew who committed the crimes,

5   but the detectives stated no charges would be filed because there was not enough
    evidence.  When asked how he felt about the fact that law enforcement did not pursue

6   the case, Edmund O. indicated that he understood they did not have any witnesses and
    thus they could not make a case.  Edmund O. stated there was nothing about the situation

7   that would prevent him from being a fair juror and that he believed he could set aside any
    feelings he might have from the case involving his cousins.

8

9       During voir dire by defense counsel, defense counsel asked if the lives of any of
    the jurors, or the lives of people they know, had been affected by gang activity.  Edmund

10  O. stated that his mother was compelled to sell some property because she was contacted
    by the City and was unable to control the gang activity on her property.  Further,

11  Edmund O. stated he had two cousins who were in the Crips gang.  In response to
    defense counsel's questions, Edmund O. stated he would not automatically convict, nor

12  would he lighten the prosecution's burden of proof, if Corona was a gang member.

13  (Lodgment No. 7 at 5-9.)

14       Using two of his peremptory challenges, the prosecutor struck both George O. and Edmund O.,

15  the only two African-American prospective jurors, after which defense counsel made a *Batson/Wheeler*[3]

16  motion.  (Lodgment No. 3 at 112-13; Lodgment No. 2, vol. 1 at 53; Supp. Lodgment at 1-2.[4])  The trial

17  judge concluded that the defense had not made a prima facie showing under *Batson* and that there was

18  "sufficient indication from both [jurors] that gave rise to a peremptory challenge."  (Lodgment No. 2,

19  vol. 1 at 54.)  With respect to George O., the judge stated he had difficulty understanding George O.'s

20  English and "that probably translated into a difficultly, at least not a sophistication, in understanding

21  English to the extent we are going to need it in this case . . . ."  (*Id.*)  With regard to Edmund O., the

22  judge said he had family members with criminal histories and who were in law enforcement, and that

23  there were "some issues with regard to those facing charges and having been victims of charges."  (*Id.*)

24       The following day, defense counsel made a motion for reconsideration of the *Batson/Wheeler*

25  motion in light of *Johnson v. California*, 545 U.S. 162, 168 (2005) which the United States Supreme

26  _____

27       [3]  *People v. Wheeler*, 22 Cal. 3d 258 (1978) is the California version of *Batson*.

28       [4]  On August 13, 2008, the Court directed Respondent to lodge a copy of the piece of paper upon which
    the prosecution's and defense counsel's peremptory strikes were written.  (*See* Order dated Aug. 13, 2008 [doc.
    no. 9].)  Respondent did so on October 20, 2008.  (*See* doc. no. 10.)

Court had decided the previous day.  (Lodgment No. 2, vol. 1 at 55-56.)  In *Johnson*, the Supreme Court

held California's requirement under *Wheeler* that a defendant must show it was "more likely than not"

a peremptory challenge was based on race was inconsistent with *Batson*, and the proper inquiry was

whether a challenge raised an "inference of discriminatory purpose."  *Johnson*, 545 U.S. at 172-73.  The

trial judge stated he had employed the appropriate "inference of discriminatory purpose" standard in his

prior ruling and not the "more likely than not" standard, and "[t]here were valid reasons that appeared

to be obvious to me on the record to support the challenges, whether [the jurors] were black, white or

green . . . ."  (Lodgment No. 2, vol. 1 at 56.)  Nevertheless, the judge gave counsel an opportunity to

make any further arguments with the clarified standard in mind.  (*Id.* at 56-57.)

Following the renewed arguments, the trial judge again noted George O.'s accent as the basis

for his conclusion there was no inference of a discriminatory purpose.  The judge stated as follows:

> THE COURT:  I'll reiterate what I said yesterday.  With regard to – were both individuals black?  Yes, they were both black.
>
> Obviously, [Edmund O.] was – the impression I got certainly was that he was born in this country and raised in this country.
>
> The impression I got from [George O.] was  – just based upon what I perceived to be a very thick accent, I, at times, had some difficulty understanding him.  He probably immigrated to this country and – is of African descent and immigrated to this country.  Not the fact that he's black or immigrated, but the difficulty I had in understanding him, notwithstanding the responses, would, in my mind, probably make him not the appropriate juror for this particular case given the facts of this case.
>
> There are a series of, from what I recall, some relatively complex issues that the jury is going to have to resolve in the matter with regard to the sales of the cars and people coming over and what they were doing.[5]  I thought there was a basis for it.

(*Id.* at 57-58.)

In an attempt to ensure compliance with *Johnson*, the judge then asked the prosecutor to explain

his reasons for the strike, and the prosecutor stated as follows:

> MR. CAMPAGNA:  Thank you.  With respect to [George O.], I echo the court's thinking on it.  That's what I had noted.
>
> Also, in my mind, I had thought – because of the responses that he gave and the way that he gave them, I had trouble understanding him.  I felt that English was not his

---

[5]  It is not entirely clear what the judge was referring to, as Corona's case had nothing to do with the sale of cars.  It appears that the judge may have been referring to the charges in the original indictment from which Corona was severed.

first language, at least it appeared to me to be the case from when he answered questions in court.

Because of the nature of this case, there's going to be a lot of – I think the court is right on that.  There's going to be a lot of terminology.  This case is going to be a lot based on street slang terms regarding the Mexican Mafia that I think it's going to be difficult for someone who English is not their first language to maybe get up to speed on that and maybe comprehend that as much as a person who does not have a language difficulty.  That was the primary reason I kicked him.

The other people – and I think there are cases – I don't have them off the top of my head, but there are cases that state that it's a proper reason.  I had people behind him that were – that I wanted to get on the jury more, people that I felt would be better jurors.  I think that's a proper reason in and of itself, although not the primary reason, as I stated before.  The primary reason was the language barrier.

With respect to [Edmund O.], . . .[t]he big thing I noted with him was that  while he did have relatives in law, he had three cousins, I think, that were murdered.  And then when we explored that more in depth with him, he actually said he had family members that were Crips.

To me, just the nature of this case and the fact that he's had such close ties with the issues that are going to surround this case, being that he had family members who were Crips – and my understanding from it, the inference that I drew was that the murders and the family members who were Crips were somehow related.  That may have been an inference that I drew, but it was one that I drew.  There was a relation.  These weren't completely separate incidents.

And so based on those things, I felt – he also stated – I noted that he said that the cops knew who did it.  And he obviously didn't – I don't think he expressed animosity towards the police.  I didn't get that feeling.  But I just thought that added into sort of the whole picture as someone who was just not right for this case.

In addition, I would note the order of these two men.  And I think that is another factor to consider.  They were seated right next to each other in line.  It's true that they were the only two African-American men on the panel.  But had one been no. 1 and the other been no. 50, I think it was basically because they were next to each other that then obviously they are in a position where they are going to get – they are ripe for going to be kicked.  Had one been no. 50, I don't think we would have ever gotten to that issue.

(*Id.* at 58-61.)

Defense counsel and the trial judge then had the following exchange:

MS. BRAUER:  Your Honor, first of all, [George O.], I personally had no problem understanding [George O].  It may be because I have an accent as well.

THE COURT:  No.

MS. BRAUER:  And certainly someone having an accent, I don't think that's a legitimate reason for exercising a peremptory.

There were absolutely no questions asked by anyone as to whether he had sufficient command of the English language.  So we really don't know about that. We

1  are drawing conclusions.  The prosecution and the court is [sic] drawing conclusions from his accent.

2

3  I would point out that an accent does not necessarily indicate that the person doesn't have a command of the language or doesn't understand.

4  In regard to –

5  THE COURT:  Let's say, for example, that you are right and Tony is mistaken in that assumption.  I don't believe that it was in this particular case.  But for the sake of

6  argument, let's say that it was an incorrect assumption.

7  Does that mean that because he exercises the challenge based upon a good faith belief that that's what would take place, that he should be penalized for it with the loss

8  of the panel that was picked?  I don't think that, in and of itself, smacks of a discriminatory reason in the rejections.

9

10  MS. BRAUER:  Your Honor, it would appear to me if he had been concerned about that, he would have asked some questions about that.

11  THE COURT:  Okay.

12  MS. BRAUER:  In regards to [Edmund O.], again, there was certainly no animosity towards law enforcement that was expressed.  The fact that he had both family

13  members who were murdered and family members that were gang members, I think that cancels each other out.

14

15  The man was, I believe, a school custodian for a long period of time.  I believe his brother-in-law is in law enforcement.  His friend's daughter is a police officer.  He's

16  holding a city job.  I don't think that's the type of person that would be hostile to the prosecution's arguments.

17  Again not enough questions were asked of him; what his feelings are, whether or not he could give an impartial consideration of the evidence relating to gangs in this

18  case.  So I still submit that the challenges were made improperly, in violation of *Batson*.

19  The fact that they were sitting next to each other, they were drawn at random. I don't see how that adds anything to the prosecution's argument.

20

21  THE COURT: Thank you.  The motion is denied.

22  (*Id.* at 61-62.)

23  b.  *Analysis of the Batson Claim*

24  An evaluation of the record leads this Court to conclude that the state appellate court's denial

25  of this claim as it relates to George O. was based on an unreasonable determination of the facts in light

26  of the evidence presented in state court.  The denial also resulted in a decision that involved an

27  unreasonable application of Supreme Court law.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Accordingly, the

28  Court recommends the petition be **GRANTED** with respect to ground one.

i.     *The Appellate Court's Opinion*

As noted above, the prosecutor stated he struck George O. because (1) he had trouble understanding George O.'s responses; (2) he felt English was not his first language; (3) it would be difficult for a person whose first language was not English to understand the terminology and "street slang" which would be used in Corona's case; (4) he did not "get a feeling from him" and did not hear a lot about why he would make a good juror; and (5) there were other individuals he wanted to get on the jury more.  (Lodgment No. 2, vol. 1 at 58-59.)  Regarding Edmund O., the prosecutor gave the following reasons for the strike: (1) he had three cousins who had been murdered; (2) he had family members who belonged to the Crips; (3) he drew an inference from Edmund O.'s responses that the murders were related to his family's membership in the Crips; (4) Edmund O.'s "close ties" with the issues surrounding the case; and (5) the police told Edmund O. that they knew who had committed the murders but could not pursue the case because there was not enough evidence.  (*Id.* at 59-60.)

The trial court did not rule on the question whether Corona had proved purposeful discrimination, but simply denied the motion.  (*See* Lodgment No. 2, vol. 1 at 62.)  The appellate court concluded that the trial judge's denial of the motion was proper and supported by the record:

> Alternatively, even assuming a prima facie case of discrimination was presented and the trial court erred in speculating about the prosecutor's reasons for excusing the two jurors, we are satisfied the court did not influence the prosecutor to present reasons that he did not genuinely entertain. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 680, fn. 7.) As to Edmund O., the trial court referred to reasons arising from family members' involvement with crime (i.e., gangs) and the criminal justice system that would have been obvious to any observer.  Similarly, as to George O., the trial court stated a fact that was facially observable; i.e., heavily-accented English that was difficult to understand.  Thus, the trial court was not providing the prosecutor with any information that was not readily apparent.  Also, when the trial court in an abundance of caution required the prosecutor to set forth his reasons, the trial court credited the prosecutor's claims that his motivations for the challenges were George O.'s possible English language difficulty and Edmund O.'s family associations and experiences with gangs and the criminal justice system.  Under well-settled principles, we defer to this credibility assessment.
>
> Corona further argues that the prosecutor's statement that the two jurors were "ripe" for being challenged because they were sitting next to each other shows that the prosecutor excused them because of their race.  This is not a reasonable inference. Reviewing the entirety of the prosecutor's remarks, it is apparent that the prosecutor was merely pointing out that if one of the men had been one of the last jurors in the jury venire (i.e., towards number 50), it is likely the requisite number of jurors would have been selected before they reached him and the issue of the exclusion of two African-Americans in the venire would not have surfaced.

/ / /

Corona also asserts the pretextual nature of the prosecutor's stated reasons for excusing the two jurors is shown by the fact that the prosecutor did not ask George O. more questions about his English language ability or whether he would make a good juror for the prosecution, and did not ask Edmund O. about the details of his family members' gang membership or whether the murder of his cousins was tied to gang activity. Although the failure to question a juror about the claimed area of concern is a valid factor to consider, here the jurors' answers provided enough information to support the race-neutral reasons and thus the lack of further questioning does not require an inference of pretext. (See *People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1018, and fn. 14.) We defer to the trial court's assessment that George O.'s strong accent was readily apparent and made him difficult to understand; thus, the prosecutor could draw inferences from this fact without further questioning. The prosecutor is not required to present reasons that rise to the level of a challenge for cause, and could reasonably decide

to peremptorily challenge a juror whose English was difficult to understand without further inquiry about his English language ability. Similarly, as to Edmund O., it was not necessary for the prosecutor to inquire about the details of the gang membership of his family members or the possible connection between the murders of his cousins and gang

activity, because these factors-even without further details and even if unconnected-could legitimately support a "hunch" that Edmund O. might not be favorable to the prosecution.

Finally, Corona contends that a comparative analysis with Juror No. 11 (who is not Black and who was not excused) shows the prosecutor's discriminatory purpose. Juror No. 11 stated that he had uncles and cousins who were gang members although "nothing really like ... they had been incarcerated," and that one cousin was involved in a National City gang. We will assume arguendo that a comparative analysis is proper for the first time on appeal. (See *People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1017; *People v. Huggins*, *supra*, 38 Cal.4th at p. 232.) Under a comparative analysis review, " '[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.' " (*People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1017.) In making the comparative analysis, the proper inquiry is whether the prosecutor "honestly found pertinent and legitimate dissimilarities between members of the group he challenged and [members of] the group he accepted." (*People v. Huggins*, *supra*, 38 Cal.4th at p. 233.)

Juror No. 11 and Edmund O. were not similarly situated so as to show that the prosecutor excused Edmund O. because of his race. Edmund O., unlike Juror No. 11, had experienced the murders of three cousins, and law enforcement had failed to prosecute those responsible for the murders. Even though Edmund O. stated this experience would not bias him, the prosecutor was entitled to reject this statement and decide not to risk keeping a juror who might have some resentment towards law enforcement. Given Edmund O.'s family history involving gangs and murders, the trial court could reasonably credit the prosecutor's overall assessment that Edmund O. was not a desirable juror for the prosecution because he had experiences too closely associated with the circumstances of the current case. The fact that Juror No. 11 also had family ties to gangs does not override the trial court's conclusion the prosecutor was not setting forth sham reasons regarding Edmund O.

We conclude the trial court made a sincere and reasoned effort to evaluate whether the peremptory challenges were exercised for race-neutral reasons, and there is substantial evidence to support the trial court's finding of no discriminatory purpose. Accordingly, Corona's appellate challenge based on the denial of his *Batson/Wheeler* motion fails.

(Lodgment No. 7 at 15-18.)

    ii.    *Clearly Established Supreme Court Law*

In *Purkett v. Elem*, 514 U.S. 765 (1995), the United States Supreme Court outlined the steps a court must follow in conducting a *Batson* analysis:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.
> *Hernandez v. New York*, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1865-66, 114 L.Ed.2d 395 (1991) (plurality opinion); *id.*, at 375, 111 S.Ct. at 1874 (O'CONNOR, J., concurring in judgment); *Batson, supra*, at 96-98, 106 S.Ct., at 1722-1723.

*Id.* at 1170-71; *see also Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004).

A state court's determination as to whether a prima facie case has been made is a factual determination entitled to a presumption of correctness. *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999). The Supreme Court has held, however that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991). Such is the case here. After defense counsel made a motion for reconsideration of her *Batson* motion, the trial judge reiterated the basis for his pervious denial. Lodgment No. 2, vol. 55-58.) He then asked the prosecutor to give his reasons for the strikes and denied the *Batson* motion again. (*Id.* 58-62.) The question whether a prima facie case has been rendered moot, and this Court's analysis must therefore focus on steps two and three of the *Batson* inquiry and the portion of the state appellate court's opinion which analyzes the prosecutor's reasons for the strikes. *Hernandez*, 500 U.S. at 359. The Supreme Court has fleshed out step two of the *Batson* inquiry in *Hernandez* as follows:

> A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

*Id.* at 360.

Difficulty with the English language has been held to be a valid race neutral reason to exercise a peremptory strike. *See United States v. Changco*, 1 F.3d 837, 840 (9th Cir. 1993); *but see Hernandez*, 500 U.S. at 371-72 (upholding strikes of Spanish speaking jurors where reason for strikes was prosecutor's fear they would substitute their own translation of Spanish testimony for interpreter's but stating that "a policy of striking all who speak a given language without regard to the particular circumstances of the trial or the individual responses of the jurors may be found by the trial judge to be a pretext for racial discrimination"). The other reasons for the strike of George O., the possible difficulty a person who did not have a command of the English language would have with street or slang terminology and the fact that the prosecutor wanted other people on the jury more, are facially race neutral as well. In addition, the reasons put forth for the strike of Edmund O. are facially race neutral.

Having put forth race neutral reasons for his strikes, the trial court was required to proceed to the third step of the *Batson* inquiry and determine "whether the opponent of the strike has proved purposeful racial discrimination." *Johnson*, 545 U.S. at 168 (citing *Purkett*, 514 U.S. at 767). At this stage, the judge is required to "assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). The trial judge must determine whether the reasons advanced by the prosecutor are "pretextual" and the judge's conclusion "'largely will turn on evaluation of credibility.'" *Hernandez*, 500 U.S. at 365 (quoting *Batson*, 476 U.S. at 98)). As the *Hernandez* court noted, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Id.* It is this stage of the *Batson* inquiry which the Court finds requires granting the petition.

      iii.      *Unreasonable Determination of the Facts*

In *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), the Ninth Circuit held that challenges to factual findings which are based entirely on the state court record are governed by 28 U.S.C. § 2254(d)(2)'s unreasonableness standard, that is, a federal court may only overturn such findings if they are "objectively unreasonable." *Id.* at 999-1000. In contrast, challenges to a state court's factual findings which are based on evidence presented to a federal court for the first time are governed by 28 U.S.C. § 2254(e)(1)'s requirement that a petitioner must rebut those findings by "clear and convincing evidence." *See* 28 U.S.C. § 2254 (e)(1); *Taylor*, 366 F.3d at 1000. The United States Supreme Court,

however, has not decided which provision applies to situations, such as this one, where a petitioner challenges the facts upon which a state court decision rests and all the operable facts were before the state court. *See Collins v. Rice*, 546 U.S. 333, 338-39 (2006) (declining to decide which section applies to a state court's credibility finding in a *Batson* challenge). The Court in *Collins* did, however, state unequivocally that "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supercede the trial court's credibility determination." Rather, the state court's credibility determination must be *unreasonable*. *Id.* at 339.

This Court is bound by Ninth Circuit authority. Accordingly, because Corona's *Batson* claim, and this Court's decision, is based entirely on the state court record, the Court will employ § (d)(2)'s standard in its review of Corona's claim, i.e., whether the state court's factual findings were objectively unreasonable in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 999-1001.

The state appellate court concluded the prosecutor's first reason for striking George O., his accent and the inference of lack of English proficiency the prosecutor drew from it, was not pretextual. It also found that the prosecutor could have properly "drawn inferences" from George O.'s strong accent and could "reasonably decide to peremptorily challenge a juror whose English was difficult to understand without further inquiry about his English language ability." (Lodgment No. 7 at 16-17.) There is no factual support in the record, however, for such inferences. As defense counsel pointed out, an accent does not automatically translate into a lack of English proficiency. (*See* Lodgment 2, vol. 1 at 61.) In fact, the record supports the *opposite* inference – that George O. *was* proficient in English. He read the juror questionnaire and answered the questions appropriately in open court, which establishes he could read English proficiently. (*See* Lodgment No. 3 at 44.) When he spoke in open court, his English was grammatically correct, which strongly suggests he spoke English proficiently, albeit with an accent. (*See id.*) There were no questions from the court reporter or pauses in the proceedings. (*Id.*) He was employed in the manufacturing field, which established he could speak and understand English sufficiently to hold a job. (*Id.*) Most importantly, neither the prosecutor nor anyone else asked any questions of George O. regarding his ability to speak and understand English, whether he was a native English speaker, whether he was an immigrant to this country and, if so, how long he

had lived here or how long he had spoken English.  There are simply no objective, factual grounds in the record which support the state appellate court's conclusion that the prosecutor's strike appropriately rested on George O.'s inability to speak or understand English sufficiently.

A second reason given by the prosecutor for the strike of George O., that it would be difficult for a person whose first language was not English to understand the terminology and "street slang" which would be used in Corona's case, is without factual support for the same reasons discussed above – there is no evidence George O. could not speak and/or understand English sufficiently.  Moreover, the record suggests the prosecutor anticipated that *all* the jurors would have difficulty understanding and interpreting the street slang and terminology which was to be used in Corona's case because he presented expert testimony designed to educate and explain to the jury the terminology and slang used in the case.  (*See* Lodgment No. 2, vol. 1 at 75-128 [testimony of Steve Contreras, Special Agent with the California Dept. of Corrections], 129-49 [testimony of Matthew Darby, Special Agent with the FBI]; vol. 3 at 424- 62, 471-500 [testimony of David Grande, Sergeant, National City Police Department].)[6]

The prosecutor's last reason, that he "did not get a feeling from [George O.] and did not hear a lot about why he would make a good juror" is both without tangible support in the record and unbelievable.  As previously noted, no one asked any questions of George O.  Thus, it is unclear how the prosecutor would have been able to determine he did not "hear a lot about why he could make a good juror" without a single question being asked about that juror's beliefs and experiences.

The Ninth Circuit has found *Batson* violations in three recent cases where, as here, the record either did not support or flatly contradicted the prosecutor's stated reasons for the strike.  In *McClain v. Prunty*, 217 F.3d 1209 (9th Cir. 2000) the prosecutor stated she struck the first African-American juror, SR, because she "mistrusted the system" and "believed that she had been treated unfairly" by it.

---

[6] Contreras testified about the structure and operation of the Mexican Mafia and street gangs in general, the symbols, colors, hand signals and names used by the Mexican Mafia, validation as a gang member, how gang members are initiated, the definitions of various street slang terms, gang monikers and how debts are repaid and repayment is enforced.  Darby testified about Monica Yanez's drug business, how it was conducted, its connection to the Mexican Mafia, how she managed her "crew" of gang members and how she enforced repayment of her debts.  Grande testified about the structure and operation of National City gangs, who is involved in those gangs, how they are validated, what crimes they are known to have committed, what monikers gang members use, what territory they claim, what symbols, colors and hand signals they use to identify themselves, how members are initiated and documented, and how Monica Yanez and the Mexican Mafia were involved in National City gangs.

1    *Id.* at 1211.  The prosecutor also believed SR had lied when she said she was a stewardess because she

2    was a heavyset woman.  *Id.*  The prosecutor's third reason for striking SR was that she lacked any group

3    decision-making experience.  *Id.*  The prosecutor stated she struck the second and only remaining

4    African-American juror, JH, because he was a drug rehabilitation counselor and would therefore "root

5    for the underdog."  In addition, he "didn't speak in ordinary language" and gave "highly intellectual

6    answers" which she believed would make it difficult for him to get along with other jurors.  *Id.*

7         Upon review of the voir dire, the Ninth Circuit concluded that the reasons given by the

8    prosecutor for the strikes were contradicted by the jurors' own answers.  SR never stated she distrusted

9    the system and gave her occupation as a maintenance worker at U.S. Airlines, not a stewardess.  *Id.* at

10   1214-15, 1221-22.  In addition, after conducting a comparative analysis with another white juror who,

11   like SR, also did not have decision-making experience but who was not struck, the court found the third

12   reason put forth by the prosecutor for SR's strike was pretextual.  *Id.* at 1211-22.  The court also

13   concluded the reasons given by the prosecutor for JH's strike were pretextual.  *Id.* at 1222- 23.  JH

14   worked as a drug research pharmacist at the Veteran's Administration, not a drug rehabilitation

15   counselor.  *Id.*  The transcript of the voir dire also contradicted the prosecutor's assertion that JH did

16   not speak in "ordinary language" or gave "highly intellectual answers."  *Id.*  The court concluded that

17   the state court's denial of the *Batson* claim was based on an unreasonable determination of the facts in

18   light of the evidence presented in state court.  *Id.* at 1223.

19        The Court came to the same conclusion in *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) and,

20   most recently, *Green v. Lamarque*, 532 F.3d 1028 (9th Cir. 2008), *as amended*.  In *Kesser*, the court

21   concluded that the reasons the prosecutor gave for his strike of a Native American woman from the jury

22   venire were pretextual based on a comparative analysis with other jurors and because they conflicted

23   with the juror's own statements on voir dire.[7]  In particular, the court noted that although the prosecutor

24   gave as reasons for the strike that she was "pretentious" and "self-important" because she believed she

25   was the only one who could complete certain paperwork for her job, "he did not ask her further

26   questions about her work or her interpersonal experiences."  *Kesser*, 465 F.3d at 354, 364.  Quoting

27

28        [7]  The prosecutor in *Kesser* struck three Native American women and one Asian woman.  The Ninth
     Circuit focused only on the strike of one of the Native American women and granted the petition on that ground
     alone, stating that "[b]ecause just one racial strike calls for a retrial, we will not determine here whether there was
     any genuine nonracial reason for striking each of [the other] jurors."  *Kesser*, 465 F.3d at 369.

*Miller-El*, the court stated that "'unless he had an ulterior reason for keeping [the juror] off the jury we think he would have proceeded differently . . . . [W]e expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.'" *Id.* at 364 (quoting *Miller-El*, 545 U.S. at 244).

In *Green*, the prosecutor struck an African-American juror, Deborah P., because "she had visited her stepfather in prison" and would therefore "likely assume imprisonment would be the outcome of [the] case," she "failed to complete two questions on the juror questionnaire" and "she had held five jobs, suggesting she must have 'problems getting along with others [and] responding to authority.'" *Green*, 532 F.3d at 1031.[8]  The court concluded that the first two reasons set forth by the prosecutor were shown to be pretextual when compared with other white jurors who were not struck. *Id.* at 1032-33.  As to the third reason, Deborah P.'s five jobs, the court stated that the validity of the reason "was undermined by the fact that he did not ask her a single question about why she changed jobs." *Id.* at 1033.  The court again quoted *Miller-El*, stating that "'[t]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.'" *Green*, 532 F.3d at 1033 (quoting *Miller-El*, 545 U.S. at 246).

Although the strike of George O. does not appear on the surface to be as egregious as the strikes in *McClain*, *Kesser* and *Green*, the principles are the same.  In each of those cases, the prosecutor put forth reasons for the strikes that were found to be pretextual either because there was no factual support in the record for them or because the prosecutor did not ask the juror any questions about the topic of concern.  As in *McClain*, where the court found the reasons set forth by the prosecutor to be contradicted by the record, the prosecutor's assertion here that George O. was not sufficiently proficient in English, and that this insufficiency would preclude him from being able to understand the terminology used in the trial, was contradicted by George O.'s ability to read and appropriately respond to the juror questionnaire.  *See McClain*, 217 F.3d at 1214-23.  The prosecutor's actions in this case are also similar to the prosecutors in *Kesser* and *Green* where the court found the prosecutors' reasons for their strikes

---

[8]  In *Green*, the prosecutor struck all six African-American jurors and noted the race of each potential juror next to their name.  *Green*, 532 F.3d at 1033.  As in *Kesser*, the Court noted this was additional evidence supporting the conclusion that the strike of Deborah P. was racially based, but reversed solely on the basis of Deborah P.'s strike.  *Id.* (citing *Kesser*, 465 F.3d at 369.)

1   to be pretextual because they did not ask any questions about the topics which they claimed were of

2   concern.   Here, the prosecutor's claim that George O.'s accent meant he could not speak and/or

3   understand English sufficiently and would not be able to understand the street slang and difficult

4   terminology to be used in the trial, is belied by the prosecutor's failure to ask any questions at all of

5   George O. and his use of expert testimony to explain the slang to the jury.  *See Kesser*, 465 F.3d at 354-

6   64; *Green*, 532 F.3d at 1032-33; *see also Paulino v. Castro ("Paulino II")*, __ F.3d __, 2008 WL

7   4070694 (9th Cir., Sep. 4, 2008) (stating that speculation is insufficient to support a finding that the

8   reason for a peremptory strike was race neutral).  In any event, "[b]ecause just one racial strike calls for

9   a retrial," it is immaterial to this Court's decision that *McClain*, *Kesser* and *Green* involved more

10   racially based strikes than occurred in Corona's case.  *See Kesser*, 465 F.3d at 369.

11      For all the foregoing reasons, the Court concludes that the state appellate court's denial of this

12   claim was based on an objectively unreasonable determination of the facts in light of the evidence

13   presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 999-1001.

14      iv.   *Unreasonable Application of Supreme Court Law*

15      The state court's denial of the claim was an unreasonable application of *Batson* and its progeny.

16   *See* 28 U.S.C. § 2254(d)(1).  The first error committed by the state courts is the trial judge's sua sponte

17   statement that George O.'s accent, and the inference of a lack of English proficiency he drew from it,

18   was a sufficient reason for the prosecutor's strike before either ruling on whether a prima facie case had

19   been made or asking the prosecutor to state his reasons for the strike.  (Lodgment No. 2, vol. 1 at 54.)

20   This error was compounded by the state appellate court's failure to recognize this as contrary to the

21   Supreme Court's *Batson* jurisprudence.  (*See* Lodgment No. 2, vol. 1 at 54, 57-58.)  The Supreme Court

22   has cautioned against a court substituting its own reasons for a strike for the prosecutor's.  *See Miller-El*,

23   545 U.S. at 252 (stating that "[i]f the stated reason [for a strike] does not hold up, its pretextual

24   significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not

25   have shown up as false").  Moreover, the Ninth Circuit has specifically held that such a procedure is an

26   unreasonable application of Supreme Court law.  *See Paulino v. Castro ("Paulino I")*, 371 F.3d 1083,

27   1089-90 (9th Cir. 2004).

28      The failure of the state courts to adequately investigate the unsupported reason for George O.'s

   strike, combined with the questionable strike of the only other African-American juror, Edmund O., also

1

2  renders the state court's denial of this claim an unreasonable application of *Batson*.  At *Batson*'s third

3  step, a judge must "assess the plausibility of that reason in light of all evidence with a bearing on it,"

4  *Miller-El*, 545 U.S. at 252, and determine "whether counsel's race-neutral explanation for a peremptory

5  challenge should be believed."  *Hernandez*, 500 U.S. at 365 (quoting *Batson*, 476 U.S. at 98)).  The

6  appellate court's analysis of the *Batson* claim fell short of this standard for two important reasons.

7       First, as discussed above, the state appellate court's denial of this claim despite the lack of

8  factual support in the record for the prosecutor's inference regarding George O.'s English proficiency

9  and his total lack of questioning regarding this purported reason for the strike illustrates that the

10  appellate court did not engage in the kind of "sensitive inquiry into such circumstantial and direct

11  evidence of intent as may be available" when deciding whether the reasons put forth by the prosecutor

12  for the strike were pretextual.  *Green*, 532 F.3d at 1030 (quoting *Batson*, 476 U.S. at 93).  Indeed, as

13  previously noted, the trial court began by suggesting the rationale for the strike.  (*See* Lodgment No. 2,

14  vol. 1 at 53-54; 57-58.)   "'A *Batson* challenge does not call for a mere exercise in thinking up any

15  rational basis'" for a strike.  *Kesser*, 465 F.3d at 359 (quoting *Miller-El*, 545 U.S. at 252).  The state

16  courts then compounded this error by failing to engage in any inquiry about the basis for the

17  prosecutor's unsupported beliefs about George O.'s English proficiency, his concomitant concerns about

18  George O.'s ability to understand the slang that would be used at trial and the prosecutor's "feeling" that

19  he would not be a good juror.  (Lodgment No. 2, vol. 1 at 58-62.)  The appellate court simply reiterated

20  the trial court's conclusion that George O.'s accent alone was sufficient to permit an inference that he

21  could not speak or understand English sufficiently to competently participate as a juror.  (Lodgment No.

22  7 at 15-18.)[9]

23       Second, when the strikes of George O. and Edmund O. are considered together, which the state

24  _____

25       [9]  In upholding the trial court's conclusion that Corona had not stated a prima facie case under *Batson*, the appellate court stated that "[g]iven the need for jurors to . . . deliberate with each other as a group, the trial

26  court could reasonably conclude that a juror whose English was difficult to understand evinced a potential language difficulty that conclusively established a race-neutral justification for a peremptory challenge."

27  (Lodgment No. 7 at 14.)  George O.'s potential difficulty communicating with fellow jurors, however, was never put forth by the trial judge or the prosecutor as a reason for the strike, but rather was generated by the appellate court for the first time.  This lends further support to this Court's conclusion that the appellate court did not

28  conduct the serious and searching inquiry into George O.'s strike that clearly established Supreme Court law requires.  *See Miller-El*, 545 U.S. at 252.  As discussed above, that the appellate court could "imagine" a race neutral reason for the strike does not abate the pretextual nature of it.  *Id.*

court was required to do under *Batson*, the reasons for the strikes appear even more pretextual.  *See Miller-El*, 545 U.S. 252; *see also Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003) (stating that "[i]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination").  A court has the duty to "consider each explanation within the context of the trial as a whole because '[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant circumstances.'" *Kesser*, 465 F.3d at 359 (quoting *Hernandez*, 500 U.S. at 363) (internal quotations omitted).  The appellate court did not follow this mandate, but instead considered the strikes independently and without regard to the reasons set forth for the strikes as a whole.

The state appellate court did conduct a comparative analysis of the strike of Edmund O. with another juror, juror number 11, who was not African-American and who was not struck by the prosecutor.  Both jurors had family members who were involved in gangs.  Edmund O. stated that he had "two cousins who were in the Crips." (Lodgment No. 3 at 85.)  Juror No. 11 stated he had "uncles and cousins who are involved or who were gang members," one of whom was involved in National City gangs.  (*Id.* at 87.)  The court concluded that "Juror No. 11 and Edmund O. were not similarly situated," however, because although both had family members who were involved in gangs, "Edmund O., unlike Juror No. 11, had experienced the murders of three cousins, and law enforcement had failed to prosecute those responsible for the murders."  (Lodgment No. 7 at 18.)  The appellate court also stated that "[g]iven Edmund O.'s family history involving gangs and murders, the trial court could reasonably credit the prosecutor's overall assessment that Edmund O. was not a desirable juror for the prosecution because he had experiences too closely associated with the circumstances of the current case." (Lodgment No. 7 at 18.)

The comparative analysis conducted by the state appellate court, however, suffers from many of the same problems as the analysis it conducted of the strike of George O.  In justifying Edmund O.'s strike, the prosecutor stated that he inferred that his cousins' murders were connected to his cousins' gang membership.  There was no evidence, however, of any connection between the two, and the prosecutor did not ask Edmund O. if the murders were gang related.  Indeed, the discussion of the murders and the gang membership occurred nearly twenty pages apart in the transcript.  (*See* Lodgment No. 3 at 68, 85.)  Moreover, Juror No. 11's gang connections were more closely related to the facts of

1  Corona's case than Edmund O.'s.  At least one of Juror No. 11's cousins was connected with National

2  City gangs, the very gangs involved in Corona's case, unlike the gang connections in Edmund O.'s

3  family. (*See* Lodgment No. 3 at 87.)  The only other justification given by the prosecutor was Edmund

4  O.'s experience with law enforcement's inability to pursue and prosecute those responsible for his

5  cousins' murders, which the prosecutor stated "added into sort of the whole picture as someone who was

6  just not right for this case." (Lodgment No. 2, vol. 1 at 60.)  The murders occurred ten years prior to

7  Corona's trial, however, and Edmund O. unequivocally stated that the experience would not affect his

8  ability to be fair.  (Lodgment No. 3 at 68-69.)

9          Moreover, the state appellate court's comparative analysis examined the strike of Edmund O.

10  and the seating of Juror No. 11 independently from the strike of George O.  It did not, however, consider

11  the comparative analysis in conjunction with the strike of George O., the only other African-American

12  prospective juror, as it was required to do by clearly established Supreme Court law.  *See Miller-El*, 545

13  U.S. at 252.  Although the strike of Edmund O. may be questionable by itself due to the discrepancies

14  between the prosecutor's stated reasons for the strike and the evidence in the record, this Court cannot

15  say the state court's conclusion regarding Edmund O.'s strike alone was objectively unreasonable.

16  When the two strikes are considered together, however, as required by clearly established Supreme

17  Court law, the pretextual nature of the prosecutor's justification for the strikes is more apparent.  *See*

18  *Miller-El*, 545 U.S. at 252.  In both strikes, the prosecutor's stated reasons were not supported by the

19  record or were based on inferences that were not supported by the record.

20          *Batson* and its progeny required the state court to consider the strikes of George O. and Edmund

21  O. together to "assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-*

22  *El*, 545 U.S. at 252.  The state court's failure to do so renders the decision an unreasonable application

23  of *Batson* and its progeny.  *See Batson*, 476 at 93; *Miller-El*, 545 U.S. at 252.

24          v.     *Conclusion*

25          As the Supreme Court has noted, "AEDPA is demanding but not insatiable." *Miller-El*, 545 U.S.

26  at 240.  After careful consideration of the record and the applicable legal authorities, the Court finds that

27  Corona has satisfied his burden under AEDPA by establishing that the state court's denial of this claim

28  was based on an unreasonable determination of the facts in light of the evidence presented in state court

and involved and unreasonable application of *Batson* and its progeny.  *See* 28 U.S.C. § 2254(d)(1)-(2);

*Williams*, 529 U.S. at 412-13.  Accordingly, the Court **RECOMMENDS** that the federal habeas relief be **GRANTED** as to claim one of Corona's petition.

      2.    *Defense Witness Claim*

Corona also contends that he was denied his Fifth, Sixth and Fourteenth Amendment rights when the trial court denied him the right to secure the presence of a defense witness.  (Pet. at 8, 9.)  Specifically, Corona complains that he was prevented from presenting the testimony of Delfina Miller because the prosecutor failed to notify the defense she had moved to Arizona during the pendency of the case and the trial court denied him a continuance to permit him to subpoena her to the trial.  (*Id.*)  Corona contends Miller was a crucial defense witness who could have impeached the victim Guyton's testimony about the identity of the shooter.  (*Id.*)  Respondent counters that the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Resp'ts Mem. of P. & A. in Supp. of Answer at 8-10.)

Corona raised this claim in the petition for review he filed in the California Supreme Court, which denied the claim without citation of authority.  (Lodgment No. 9.)  Accordingly, this Court must "look through" to the California appellate court's denial of this claim for its analysis.  *Ylst*, 501 U.S. at 801-06.  That Court recounted the underlying facts surrounding this claim, to which this Court must defer under 28 U.S.C. § 2254(e)(1):

> [On] or about February 2004, Corona's counsel learned from a police report provided during discovery that Delfina [footnote omitted] was a relevant defense witness.  Delfina subsequently moved to Arizona, but the defense did not discover this until trial had already started.  Finding that the defense had not been diligent in looking for Delfina before trial, the trial court denied the defense request for a continuance to secure Delfina's attendance at trial, and also denied the defense's new trial motion.
>
> Delfina was interviewed by Officer Damian Ballardo at the time of the shooting and by defense investigator Esteban Hernandez after the trial had concluded. [footnote omitted.]  Delfina, who at the time of the shooting lived near the intersection of Paradise Drive and East 10th Street where the shooting occurred, provided the following information.  At about 11:00 p.m., she was in bed when she heard an argument that made her dogs bark.  She then heard three gunshots.  She jumped out of bed and ran to her front window that faces East 10th Street.  She saw a man, who appeared to come from the same area as the shots, run past the front of her house.  After she alerted her husband and as her husband went to the man lying on the street, Delfina saw a car driving the wrong way down the one-way street.  The car stopped on the corner of East 10th Street and Paradise Drive, picked up the man who had run past her house, and then drove southbound on Paradise Drive.  The car was an older, white, "Cholo-type" car with four doors.  She only heard one car on the street.

Corona's counsel, Inge Brauer, considered Delfina an important impeachment witness because her description of the white vehicle at the scene was different from the black, two-door vehicle described by Guyton.

It was apparent from the police report provided during discovery that Delfina was an important defense witness. Because Delfina's address was redacted from the police report, on December 15, 2004, Attorney Brauer requested that the prosecutor provide Delfina's address and telephone number. On January 7, 2005, the prosecutor provided Attorney Brauer with an address for Delfina on East 10th Street. On this same date, the prosecutor notified Attorney Brauer that Delfina's husband, James Miller, was a potential
prosecution witness. The prosecutor was contemplating having James testify because he had called 911 on the night of the shooting; however, according to the prosecution, he did not have any further information pertinent to the issues.

On January 7, 2005, Attorney Brauer instructed defense investigator Hernandez to locate and interview Delfina. Hernandez's efforts to locate Delfina were unsuccessful. In a report he prepared for Attorney Brauer dated June 19, 2005, Hernandez delineated these efforts. Hernandez stated he went to the 10th Street address provided by the prosecutor at varying times on January 8, 10, 13, and 19; February 8, 19, and 23; and April 11 and 22, 2005. There was no answer at the door, and the neighbors had no information on Delfina's schedule. Hernandez believed Delfina still lived at the residence but that she was "'dodging'" him. On May 19, 2005, a woman answered the door and told Hernandez that Delfina did not live there, and she had no information about her whereabouts. On May 20, 3005, Hernandez performed a database search for Delfina's address, but the search failed to provide a Social Security number for Delfina. Hernandez reported he could not locate her without a Social Security number. On June 10 and 14, 2005, Hernandez left a subpoena for Delfina at her last known address on 10th Street.

According to Attorney Bauer, during the week before the scheduled trial date of June 13, 2005, the prosecutor informed her that he would likely call James Miller as a witness. At the time of this discussion regarding James, there is no indication that [the] defense advised the prosecutor that she was having trouble locating James's wife Delfina, and apparently the prosecutor did not yet know the Millers had moved.

On June 9, 2005, the prosecutor's investigator went to subpoena James at the 10th Street address and discovered the Millers had moved to Arizona. The prosecutor's office did some investigation and found an address and telephone number for the Millers in Arizona. However, the prosecutor decided it was not worth bringing James from Arizona to testify about the 911 call and accordingly did not attempt to make contact with him. The prosecutor did not advise Attorney Brauer of the fact that Miller had moved to Arizona.

The jury was selected on June 13, 2005, and the prosecutor's witnesses began testifying on June 14, 2005.

On June 15, 2005, the defense discovered that the Millers had moved to Arizona. On that date, defense investigator Hernandez received a telephone call from Pete Matey advising that he had bought the house from the Millers the previous year and that the Millers had moved to Arizona. Hernandez performed a records check on the 10th Street property which confirmed the sale to Matey and listed the transfer date as May 2004. Attorney Brauer immediately told the prosecutor about this information and the prosecutor gave her the telephone number and address for the Millers in Arizona that his office had uncovered. Hernandez attempted to call the telephone number in Arizona on

June 15, 16, 17, 18, and 19, 2005, but the phone was answered by a fax machine.

On June 15, 2005, while the prosecution was still presenting its case in chief, Attorney Brauer orally advised the court of the problems she was having securing Delfina's testimony.  Attorney Brauer explained to the court that the prosecutor had provided her an address where Delfina no longer lived, that she had just received Delfina's Arizona address, and that she would try to have her subpoened in Arizona. Attorney Brauer also stated she would do everything possible to have Delfina available when it was time for her to testify, but that a recess might be necessary.  The trial court indicated that the decision as to whether [to] allow a recess would be made at the appropriate time.

On June 16 and 17, 2005, Attorney Brauer obtained a certificate for attendance of a material out-of-state witness from the trial court, and communicated with the public defender's office in Arizona about the need to secure Delfina's attendance in court on June 21, 2005.  On June 20, 2005, the Arizona public defender's office responded that it took one month to complete the out-of-state subpoena process through the Arizona courts and that it would be impossible to have Delfina available to testify on June 21.

On June 20, 2005, after the prosecution had rested, Corona moved for a mistrial, or for a continuance until Delfina's attendance could be secured.  Corona asserted the prosecution was dilatory in providing an up-to-date address for Delfina, and because of the prosecution's delay it was unlikely Delfina's attendance could be secured through an out-of-state subpoena before the conclusion of the trial.  Corona's counsel acknowledged that the prosecution generally has no duty to keep track of noninformant witnesses.  However, defense counsel asserted that because the address had been redacted from the police report and the prosecution did not provide the address until much later, the prosecution was obligated under *Brady [v. Maryland*, 373 U.S. 83 (1963)] to verify Delfina's address at the time it was disclosed.

On June 20, 2005, the court denied Corona's requests for relief.  The court found the prosecutor satisfied its duty by disclosing Delfina's last known address; the prosecutor had no affirmative duty to maintain a current address for Delfina; and there was no indication the prosecutor had tried to hide Delfina's current address from the defense.  Further, the court found the defense failed to conduct an adequate investigation to find Delfina.  The court stated that repeatedly returning to the residence was insufficient, and that the defense could have searched such common sources as Department of Motor Vehicle records, voter registration records, and tax records. [footnote omitted.]

On June 21, 2005, trial proceeded with the presentation of defense witnesses, closing arguments, and instructions.  The jury reached its verdict on June 22, 2005.

On September 12, 2005, Corona filed a motion for a new trial on essentially the same grounds as his midtrial request for a mistrial or continuance.  To support his motion, Corona submitted a report from defense investigator Hernandez who, after the trial was over, interviewed Delfina on September 7, 2005, in Arizona, confirming the substance of what her testimony would have been.  The trial court denied the new trial motion, again finding the prosecution did not violate *Brady*'s disclosure requirements.

The court also found there was no newly discovered evidence warranting a new trial.  With respect to the issue of due diligence, during oral arguments on the new trial motion, defense counsel offered to have the defense investigator testify as to his pretrial efforts to contact Delfina.  Defense counsel stated that the investigator had – in addition to going to the residence – looked in a database which revealed only the same 10th Street address.  Although at one point during the discussions the trial court suggested the

1    defense's efforts may have been sufficiently diligent, the court determined it was not

2    necessary for the investigator to testify, and ultimately the court was not persuaded to
     grant the new trial motion.

3

4          The court also found that the absence of Delfina's testimony was not prejudicial.
     The court concluded that although Delfina's testimony might have been beneficial to the
     defense as "fodder for argument," it would not have altered the outcome because the
     "victim/witness, was extremely credible, believable to the panel, notwithstanding the
5    other baggage he had."

6

7    (Lodgment No. 7 at 19-25.)

8          a.    *Brady Violation*

9    Corona contends, as he did in state court, that the prosecution violated his due process rights by

10   preventing him from presenting Delfina's testimony when they failed to inform the defense of the

11   Millers' move to Arizona.   The state appellate court analyzed Corona's claim under *Brady* and

12   California cases applying *Brady* as follows:

13          *Brady* establishes that "suppression by the prosecution of evidence favorable to
     an accused . . . violates due process where the evidence is material to either guilt or
14   punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*,
     *supra*, 373 U.S. at p. 87.) Regardless of whether the defendant has requested disclosure,
15   the prosecution must seek out and disclose all material exculpatory and impeachment
     evidence known to those acting on the government's behalf. (*In re Brown*, (1998) 17
16   Cal.4th 873, 879-880; *People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)  When
     exculpatory evidence involves an eyewitness, the prosecution must disclose the witness's
17   identity and "'all pertinent information which might assist the defense to locate [the
     witness].'" (*People v. Robinson* (1995) 31 Cal.App.4th 494, 499; see *In re Littlefield*
18   (1993) 5 Cal.4th 122, 132.) [footnote omitted.]  The prosecution may not avoid this
     obligation by deliberately failing to learn the whereabouts of a witness. (See *Littlefield*,
19   *supra*, at p. 132.) Further, the prosecution is obligated to preserve exculpatory evidence
     that the defendant cannot obtain by other means. (*People v. Caitlin* (2001) 26 Cal.4th
20   81, 159-160.)

21          However, there is generally no *Brady* violation when the government fails to
     provide information that it does not know about. (*United States v. Chen Hsieh Hui Mei*
22   (9th Cir. 1995) 67 F.3d 1421, 1428-1429.)  These limits on the *Brady* disclosure
     requirements are consistent with the principle that the prosecution does not have a
23   general duty to gather evidence that might be useful to the defense. (*In re Littlefield*,
     *supra*, 5 Cal.4th at p. 135.)  Similarly, as to the location of witnesses who are not
24   informants, the government generally has no duty to "produce or keep track of witnesses
     the defendant may later wish to have testify." (*People v. Rance* (1980) 106 Cal.App.3d
25   245, 253-254.) [footnote omitted.]  There is no due process violation if the defendant
     had the opportunity to assure the witness's presence at trial, and the prosecutor does not
26   engage in conduct which deprives the defendant of this opportunity. (*Bellizzi v. Superior
     Court*, *supra*, 12 Cal.3d at pp. 36-37, and fn. 2.)

27

28         Here, once law enforcement obtained Delfina's address at the time of the
     shooting, it was not obligated to keep track of her whereabouts for the defense.  The
     prosecution provided Corona with the address it had for Delfina, and Corona had six

1    months before trial to verify if the address was correct and to research a new address.

2    The prosecution did not know that the Millers had moved until shortly before trial, and
     did not know that Corona was having trouble locating Delfina.  Thus, the prosecution did
3    not suppress any information about Delfina in its possession nor attempt to mislead
     Corona about her whereabouts.  There was no *Brady* violation, and the trial court did not
4    err in denying Corona's request for a mistrial, continuance or new trial on this ground.

5    (Lodgment No. 7 at 25-27.)

6        As the state court properly noted, the Supreme Court held in *Brady* that a prosecutor must

7    disclose all material evidence, including impeachment evidence, to the defendant.  *Brady*, 373 U.S. at

8    87;  *United States v. Bagley*, 473 U.S. 667, 676, 678 (1985).  In order to establish a *Brady* violation,

9    Petitioner must show (1) the evidence was suppressed by the prosecution, either willfully or

10   inadvertently; (2) the withheld evidence was exculpatory or impeachment material; and (3) he was

11   prejudiced by the failure to disclose.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Benn v.*

12   *Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002) (citing *Bagley*, 473 U.S. at 676, 678 and *United States*

13   *v. Agurs*, 427 U.S. 97, 110 (1976).)

14       i.    *Suppression by the Prosecution*

15       The first hurdle Corona must clear is whether the prosecutor willfully or inadvertently

16   suppressed evidence.  *Strickler*, 527 U.S. at 281-82.  The California appellate court concluded, citing

17   California cases and federal cases which predate *Strickler*, that because "the prosecution did not know

18   that the Millers had moved until shortly before trial, and did not know that Corona was having trouble

19   locating Delfina" no *Brady* violation occurred.  (Lodgment No. 7 at 27.)  This is contrary to *Strickler*,

20   which states that a *Brady* violation can occur when the prosecutor *inadvertently* suppresses evidence.

21   *Strickler*, 527 U.S. at 281-82.  Moreover, in *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), the Supreme

22   Court concluded that in addition to exculpatory or impeaching evidence they are actually aware of,

23   prosecutors "'[have] a duty to learn of any favorable evidence known to the others acting on the

24   government's behalf in [the] case, including the police.'"  *Strickler*, 527 U.S. at 280-81 (quoting *Kyles*,

25   514 U.S. at  437-38).  While "*Brady* does not necessarily require that the prosecution turn over

26   exculpatory material *before* trial."  *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988)

27   (emphasis in original), the material must be disclosed "'at a time when disclosure would be of value to

28   the accused.'"  *Id*. (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985)).

Thus, although it appears the prosecutor himself was not aware of Delfina Millers' move until about a week before trial, he cannot escape *Brady* liability.  At a minimum, the prosecutor should have disclosed the Millers' Arizona address as soon as he became aware of it through his investigator on June 9, 2005.  (*See* Lodgment No. 2, vol. 3 at 516; Lodgment No. 7 at 21.)  The prosecutor did not disclose the information to defense counsel, however, until June 15, 2005 when defense counsel told the prosecutor she had learned from her investigator that the Millers had moved from the 10th Street address over a year before and asked if he had a current address.  (Lodgment No. 2, vol. 2 at 198.)  Moreover, it is unclear whether the information was disclosed in sufficient time for defense counsel to decide whether to use it in her defense strategy.  By the time the information was turned over, defense counsel had already given her opening statement and had told the jury that Delfina would be testifying.  Accordingly, the Court concludes Corona has satisfied the first prong of the *Brady* test.  *See Strickler*, 527 U.S. at 281-82.

> ii.  *Whether the Evidence Was Exculpatory or Impeachment*

Corona must also establish the claimed evidence had exculpatory or impeachment value.  *Strickler*, 527 U.S. at 281-82; *see also United States v. Starusko*, 729 F.2d 256, 260 (3d Cir. 1984) (stating that "[e]xculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence, as well as that which might alter the jury's judgment of the credibility of a crucial prosecution witness.")  The victim, Kenneth Guyton, testified Corona and "Trips" drove him around in Trips' black Bronco.  They stopped in a remote area in National City where Corona ordered him out of the car and shot him in retaliation for failing to pay a drug debt to Trips' sister, Monica Yanez.  (Lodgment No. 2, vol. 2 at 233-44.)  Delfina Miller was to testify that she heard the shots, then saw a young man run past the front of her house.  (Lodgment No. 1, vol. 2 at 399.)  She went outside and saw the victim lying in street.  As she looked up, she saw an older, white, four-door vehicle driving the wrong way down the one-way street.  (*Id.*)  The white car picked up the man who had been running.  (*Id.*)

Corona's defense was that Guyton was misidentifying Corona as the shooter due to Guyton's drug use and because he had been woken up just prior to the shooting and was disoriented.  (Lodgment No. 2, vol. 2 at 201-72, 284-327.)  The defense also tried to suggest that Guyton did not know who shot

1  him and was simply assuming Corona had done so at Yanez's direction due to his drug debt. (*Id.*) Thus,

2  it is clear that Delfina's testimony that she saw a man she thought was associated with the shooting get

3  into a white car and drive away would have impeached Guyton's identification of Corona as the shooter.

4        iii.    *Materiality or Prejudice*

5       Finally, Corona must establish he was prejudiced by the withholding of the evidence because

6  it was material. *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676.) "[E]vidence is material only

7  if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

8  proceeding would have been different. A 'reasonable probability' is a probability sufficient to

9  undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *see also Downs v. Hoyt*, 232 F.3d

10  1031, 1037 (9th Cir. 2000).

11       Corona has failed to establish such a "reasonable probability." Delfina's testimony about the

12  white car does not directly contradict Guyton's testimony that Corona was traveling in a black Bronco

13  when he shot Guyton, nor does it cast doubt in any significant way on Guyton's identification of Corona

14  as the shooter. Delfina may indeed have seen an individual connected with Guytons' shooting get into

15  a white car after the shooting. The jury could easily have concluded after hearing both Guyton's and

16  Delfina's testimony that they were both correct – that Corona and Trips drove Guyton to a deserted

17  location, Corona shot Guyton, then either Corona or Trips ran to the white car and drove away. The

18  most compelling evidence of Corona's guilt was Guyton's steadfast identification of Corona as the

19  shooter. In the face of this testimony, Delfina's testimony was not material to Corona's defense, and

20  he was not prejudiced by his inability to present it.

21        iv.    *Conclusion*

22       While Corona has established that the prosecution suppressed impeachment evidence in violation

23  of *Brady* and its progeny, he has failed to establish the evidence was material and that he was prejudiced

24  by his inability to present it to the jury. Accordingly, the state court's denial of this claim was neither

25  contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See Early*, 537

26  U.S. at 8 (stating that "so long as neither the reasoning nor the result of the state-court decision

27  contradicts [Supreme Court precedent,]" the state court decision will not be contrary to clearly

28  established federal law).

1    b.    *Denial of a Continuance*

2    Corona also claims the state court's denial of a continuance based on the failure of the

3    prosecution to provide an accurate address for Delfina violated his due process rights.  (Pet. at 6-10.)

4    Respondent contends the state court's denial of this claim was neither contrary to, nor an unreasonable

5    application of, clearly established Supreme Court law.  (Mem. of P. & A. in Supp. of Answer at 9-10.)[10]

6    Corona raised this claim in the petition for review he filed in the California Supreme Court,

7    which denied it without citation of authority.  (Lodgment No. 9.)  Accordingly, this Court must "look

8    through" to the California appellate court's denial of the claim as the basis for its analysis.  *Ylst*, 501

9    U.S. at 801-06.  That court, citing California law, wrote:

10       When Corona requested a continuance midtrial, he submitted a report reflecting
         that his defense investigator went to the 10th Street address on 10 occasions between
11       January and April 2005 during morning, afternoon and evening time, and on each
         occasion, there was "no answer at [the] door."  On two occasions the investigator spoke
12       to neighbors who "had no information on Delfin[a]'s schedule."  There is nothing in the
         report to indicate that the investigator took any steps to try to find Delfina during this
13       time period other than visit her residence.  It was not until May 20, 2005, after contacting
         a woman at the residence who stated Delfina did not live there, that the defense finally
14       performed a database search, which was apparently abandoned when no Social Security
         number was obtained.  The trial court could reasonably conclude that the defense should
15       have taken other investigative measures once it discovered that visits to the residence
         over a four-month period were not fruitful, and that the database search finally conducted
16       in May 2005 should have been more extensive.  The court also could reasonably
         determine that a one-month delay of the trial to secure the out-of-state subpoena was
17       unreasonable in light of the lengthy period of time that the defense had to find Delfina
         after the disclosure of her identity and address and before the commencement of the trial.
18       The trial court did not abuse its discretion in denying the midtrial continuance based on
         lack of diligence by the defense.

19

20   (Lodgment No. 7 at 28-29.)

21       In *Ungar v. Sarafite*, 376 U.S. 575 (1964), the Supreme Court stated in the context of the Sixth

22   Amendment right to counsel as follows:

23       The matter of continuance is traditionally within the discretion of the trial judge,
         and it is not every denial of a request for more time that violates due process even if the
24       party fails to offer evidence or is compelled to defend without counsel.  *Avery v.
         Alabama*, 308 U.S. 444 [citations omitted.]  Contrariwise, a myopic insistence upon
25       expeditiousness in the face of a justifiable request for delay can render the right to
         defend with counsel an empty formality.  *Chandler v. Fretag*, 348 U.S. 3 [citations
26       omitted.]  There are no mechanical tests for deciding when a denial of a continuance is
         so arbitrary as to violate due process.  The answer must be found in the circumstances

27

28       [10]  To the extent that Corona's claims are based on errors in the interpretation or application of state law,
     he is not entitled to federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

1  present in every case, particularly in the reasons presented to the trial judge at the time
2  the request is denied. *Nilva v. United States*, 352 U.S. 385 [citations omitted]; *Torres v. United States*, 270 F.2d 252 (C.A. 9th Cir.) *cf. United States v. Arlen*, 252 F.2d 491 (C.A. 2d Cir.)

3

4  *Id.* at 589; *see also Morris v. Slappy*, 461 U.S. 1, 11-12 (1983).

5      As the state court noted, under California law, in order to obtain a continuance to secure the

6  testimony of a witness, the party requesting the continuance must establish they were diligent in

7  preparing for the trial. *See* Cal. Penal Code § 1050; *People v. Jenkins*, 22 Cal. 4th 900, 1037 (2000).

8  The state court's conclusion that counsel was not diligent was not "myopic insistence upon

9  expeditiousness in the face of a justifiable request for delay." *Ungar*, 376 U.S. at 589; *see also Harper*

10 *v. Scribner*, 244 Fed. Appx. 773, 773-774 (2007) (holding that a state court's denial of a continuance

11 to secure the testimony of a witness where diligence had not been shown did not violate Petitioner's

12 Sixth Amendment due process rights); *Harris v. Henry*, 228 Fed. Appx. 710, 712 (2007) (same). Rather,

13 the state court reasonably concluded that defense counsel should have used other measures to locate

14 Delfina during the six months she had Delfina's last known address and the beginning of trial.  Given

15 the high level of deference this Court is required to give the state court's decision, both under AEDPA

16 and under *Ungar*, the state court's decision was not contrary to, nor an unreasonable application of,

17 clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.

18      c.     *Denial of a Motion for a New Trial*

19      Finally, Corona argues the state court's denial of his motion for a new trial based on what

20 Delfina would have testified to violated his federal due process rights.  (Pet. at 6-10.)  Respondent does

21 not address this claim in the Answer.

22      Corona exhausted this claim by presenting it in his petition for review to the California Supreme

23 Court. (*See* Lodgment No. 8.)  That court denied the claim without citation of authority. (*See* Lodgment

24 No. 9.)  Accordingly, this Court must "look through" to the California appellate court's opinion denying

25 this claim for its analysis. *Ylst*, 501 U.S. at 801-06.  Relying on California law, that court concluded as

26 follows:

27      During the trial Corona knew Delfina's address in Arizona and the substance of her
28      testimony, and the trial court ruled that a continuance should not be granted to secure
       Delfina's attendance because of the defense's lack of diligence.  There was nothing new

1    regarding Delfina's location or testimony presented at the new trial motion.  Although
     at the hearing on the new trial motion defense counsel proffered evidence regarding
2    additional pretrial efforts made by the defense investigator to find Delfina, defense
     counsel offered no explanation as to why any additional information regarding the
3    investigator's efforts were not fully delineated at the time of the midtrial continuance
     motion.  Thus, no newly discovered information was presented requiring the trial court
4    to grant the new trial motion.

5    (Lodgment No. 7 at 30.)

6        In Corona's case, the state court made a factual finding, which is supported by the record, to

7    which this Court must defer under 28 U.S.C. § 2254(e)(1), that "no newly discovered evidence was

8    presented . . . ."  (*Id.*)  Further, even if Delfina's testimony was "newly discovered evidence," Corona

9    would not be entitled to federal habeas relief.  The Supreme Court has stated as follows:

10       Where newly discovered evidence is alleged in a habeas application, evidence
         which could not reasonably have been presented to the state trier of facts, the federal
11       court must grant an evidentiary hearing.  Of course, such evidence must bear upon the
         constitutionality of the applicant's detention; the existence merely of newly discovered
12       evidence relevant to the guilt of a state prisoner is not a ground for relief on federal
         habeas corpus.
13

14   *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (quoting *Townsend v. Sain*, 372 U.S. 293 (1963)).

15       As discussed in Section IV(B)(2) of the Report and Recommendation, the inability of Corona

16   to present Delfina Miller's testimony did not result in any Constitutional violation.  Accordingly, the

17   state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly

18   established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

19   **V.    CONCLUSION AND RECOMMENDATION**

20       The Court submits this Report and Recommendation to United States District Judge Barry Ted

21   Moskowitz under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court

22   for the Southern District of California. For the reasons outlined above, **IT IS HEREBY**

23   **RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and

24   Recommendation, and (2) directing that Judgment be entered conditionally granting the Petition.

25       **IT IS ORDERED** that no later than **December 3, 2008,** any party to this action may file written

26   objections with the Court and serve a copy on all parties.  The document should be captioned

27   "Objections to Report and Recommendation."

28   / / /

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and

2    served on all parties no later than **December 13, 2008**.  The parties are advised that failure to file

3    objections within the specified time may waive the right to raise those objections on appeal of the

4    Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d

5    1153, 1156 (9th Cir. 1991).

6    DATED:  November 3, 2008

7

8    Hon. Nita L. Stormes
     U.S. Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28